# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAO MEE XIONG, | ) 1:10cv01135 AWI DLB |
| | ) |
| | ) |
| Plaintiff, | ) FINDINGS AND RECOMMENDATION |
| | ) REGARDING PLAINTIFF'S |
| v. | ) SOCIAL SECURITY COMPLAINT |
| | ) |
| MICHAEL J. ASTRUE, Commissioner | ) |
| of Social Security, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

## BACKGROUND

Plaintiff Pao Mee Xiong ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for supplemental security income pursuant to Title XVI of the Social Security Act. The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Magistrate Judge for Findings and Recommendations to the District Court.

## FACTS AND PRIOR PROCEEDINGS[1]

Plaintiff filed her application on August 16, 2005, alleging disability since April 1, 2005, due to depression, a sleep condition, back pain and asthma. AR 85-89, 114-119. After her application was denied initially and on reconsideration, Plaintiff requested a hearing before an

---

[1] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

1   Administrative Law Judge ("ALJ").   AR 39, 73-77, 80-84.   ALJ James Berry held a hearing on

2   July 24, 2007, and issued a decision denying benefits on August 16, 2007.   AR 14-29, 43-70.

3   The Appeals Council denied review on February 25, 2010.   AR 4-7.

4        Hearing Testimony

5        ALJ Berry held a hearing on July 24, 2007, in Fresno, California.   Plaintiff appeared with

6   her attorney, Jeffrey Milam, and testified with the help of an interpreter.   Vocational expert

7   ("VE") Jose Chaparro also appeared and testified.   AR 43.

8        Plaintiff testified that she was born in Laos in 1958.   AR 47.   She does not hear well and

9   wears hearing aides in both ears.   AR 47.   Plaintiff is married and lives with her husband, who

10   works, and 5 of her children.   AR 48.   The youngest child living with her is 6.   Plaintiff came to

11   the United States from Thailand, though she does not remember when, and is not a citizen of this

12   country.   AR 49.   Plaintiff does not know what her husband does for work, only that he works

13   "in a company."   AR 50.

14        Plaintiff did not go to school in Thailand or the United States.   She understands some of

15   the words in the Hmong Bible, but does not read or write in English.   AR 50.   Plaintiff worked

16   once in the United States for two weeks.   She has never had a driver's license and her youngest

17   sister often takes her places.   AR 51, 52.

18        Plaintiff did not believe that she could work at any job because she has a "lot of worries, a

19   lot of issues in [her] head and can't really think of what [she] needs to do."   AR 52.   Plaintiff

20   takes medication for this and sees a mental health doctor.   AR 52.   When asked what she worries

21   about, Plaintiff testified that her ears don't work well and she has a lot of illnesses.   She also has

22   problems with her back.   AR 53.   Her worries affect her sleep and eating and sometimes make

23   her think that she wants to die.   AR 54.

24        Plaintiff goes to church with her family once a week and her children read the Bible to

25   her.   When she's at church, she does not visit with people because of the issues in her head.   AR

26   54.   Plaintiff went to the last Hmong New Year celebration but there was nothing for her to do

27   and she stayed by herself.   AR 55.

28

1    Plaintiff explained that her back pain hurts all the time and that she has difficulty moving.

2  The pain spreads to her shoulders and seems like it prevents her from breathing.  Plaintiff

3  thought that she could be on her feet for about 30 minutes at one time and sit for about 60

4  minutes at once.  She can carry less than a half gallon of milk.  AR 55-57.  She could walk past

5  about 3 or 4 houses before needing to stop.  AR 61.  Plaintiff thought that she could concentrate

6  for about 10 minutes at a time.  AR 58.

7    Plaintiff takes medicine everyday but it does not really help the pain.  She also lies down

8  to help with the pain and when the medication makes her drowsy, about 7 to 8 times per day.

9  She said she lies down more than she stands during the day.  AR 57-58.  When she lies down,

10  she uses ice and Ben-Gay.  Her daughter gives her massages.  AR 59.  She also tries Asian

11  methods of treatment.  AR 60.

12    Plaintiff's children do most of the housework and her husband does the cooking.  Plaintiff

13  cannot do these things because if she bends to sweep the floor, she passes out or would be badly

14  hurt.  AR 59.

15    For the first hypothetical, the ALJ asked the VE to assume a person of Plaintiff's age,

16  who was illiterate and had no past relevant work experience.  This person could lift and carry 20

17  pounds occasionally, 10 pounds frequently, and sit, stand and walk for 6 hours each.  This person

18  would need to avoid exposure to unprotected heights and dangerous moving machinery.  This

19  person could perform simple, repetitive tasks and maintain attention, concentration, persistence

20  and pace.  This person could adapt to usual changes in the work setting, adhere to safety rules

21  and relate and interact with others.  This person would need to avoid exposure to loud noise.  The

22  VE testified that this person could perform the light positions of flower picker, housekeeping

23  cleaner and tier.  AR 63-64.

24    For the second hypothetical, the ALJ asked the VE to assume that this person could lift

25  and carry less than 10 pounds, sit for one hour, stand for 30 minutes and walk less than one

26  block.  This person would need to lie down 7 or 8 times a day for an indeterminate amount of

27  time and would have difficulty maintaining concentration for more than a 10 minute span.  The

28  VE testified that this person could not perform any work.  AR 64.

Plaintiff's attorney asked the VE to add the following limitations to the first hypothetical: a fair ability to understand and remember very short and simple instructions, a poor ability to remember detailed instructions, a poor ability to maintain attention and concentration, a fair ability to accept instructions from supervisors and respond appropriately, a poor ability to sustain an ordinary routine without special supervision, a poor ability to complete a normal workday or workweek without interruption at a constant pace, a poor ability to interact with coworkers and a poor ability to deal with various changes in the work setting.  This person would also have a moderate likelihood of emotionally deteriorating in the workplace.  The VE testified that this person could not work.  AR 65.

Plaintiff's attorney also asked the VE to add the following limitations to the first hypothetical: this person can stand and walk for 0 to 2 hours and would be unable to stand erect. This person could sit for 4 to 6 hours but cannot sit in an erect fashion.  This person would need a walker if she planned on walking long distances or on uneven terrain.  She could lift 10 to 20 pounds bilaterally.  This person could not perform prolonged bending, stooping or crouching and would be limited to frequent reaching, handling and fingering.  The VE testified that this person could not work.  AR 66.

Plaintiff's attorney next asked the VE to assume that this person had a sedentary residual functional capacity with visual limitations.  This person could perform simple, repetitive tasks. The VE testified that the light positions identified in the original hypothetical would not be available.  AR 67.

Plaintiff's attorney also asked the VE to assume that this person could perform simple, repetitive tasks, lift 20 pounds occasionally and 10 pounds frequently, stand and walk for 6 hours and sit for 6 hours.  This person could not drive because of a limited field of vision and had to avoid concentrated exposure to fumes, dust, odors, gases and poor ventilation.  This person also needed to avoid hazards.  The VE testified that this person could perform the positions of flower picker, housekeeping cleaner and tier.  AR 67-68.  If this person could not be around a lot of background noise, she could not perform the tier position but could perform the positions of flower picker and housekeeping cleaner.  AR 69.

<u>Medical Record</u>

X-rays of Plaintiff's left foot taken on July 1, 2003, showed an undisplaced fracture involving the base of the fifth metatarsal.  AR 178.

From July 24, 2003, through August 25, 2005, Plaintiff received chiropractic treatment for neck and back pain and headaches.  At her initial visit in July 2003, she reported that she had left hip pain after a trip and fall in June 2003.  AR 142.  In April 2005, she reported that she fell and hit her head on the wall.  She reported a dull, radiating pain and was taking Advil.  AR 135-143.

On April 26, 2005, Plaintiff reported falling and hitting her head after tripping on something.  AR 206.  X-rays of her cervical spine performed on April 27, 2005, showed mild levoscoliosis that was likely due to muscle spasm.  There were no other significant abnormalities.  AR 173.  X-rays of her thoracic spine showed mild dextroscoliosis centered at T6.  AR 174.

On September 8, 2005, Plaintiff saw Greg Hirokawa, M.D., for a psychiatric evaluation.  Plaintiff complained of feeling depressed and anxious, with poor sleep.  She cries easily and occasionally thinks about suicide.  Plaintiff primarily stays home and suffers fatigue, loss of interest, poor concentration and forgetfulness.  She also reported hearing loss, vision problems and feeling worthless.  Plaintiff reported that she forgets to take her medicine and also complained of flashbacks of when she was in her home country and the problems with the war.  She came to the United States in approximately 1975 and reported that she has been depressed for a long time.  Plaintiff has a 4 year old son with various medical problems, including a past heart operation.  AR 144.

Plaintiff denied prior mental health treatment and denied psychiatric hospitalizations.  On mental status examination, Plaintiff's hygiene was fair, her eye contact was poor and her facial expression was sad.  Thought content was appropriate and she denied auditory or visual hallucinations.  Her mood was depressed and her affect was tearful.  Plaintiff reported poor sleep and appetite.  She did not know the date and her intellectual functioning appeared to be in the below average range.  Recent and past memory was intact.  She did not know why the moon looked larger than the stars or why food is refrigerated.  She could not perform simple

5

calculations but she could perform a simple, two-step command.  Plaintiff does not perform household chores because she is forgetful and has left food on the stove before.  During a typical day, she stays home, takes care of her child and feels depressed.  AR 145-147.

Dr. Hirokawa diagnosed major depressive disorder, recurrent, moderate, and post traumatic stress disorder.  There was no evidence of exaggerating and there did not appear to be any inconsistencies during the evaluation.  Her inability to perform certain segments of the examination appeared to be reflective of cultural and educational issues rather than cognitive deficits.  The likelihood of her condition improving over the next 12 months was fair with treatment, poor without treatment.  Her attitude towards seeking employment is poor and she had no prior work history.  AR 148.

Dr. Hirokawa opined that Plaintiff had a fair ability to understand and remember very short and simple instructions, a poor ability to understand and remember detailed instructions, a poor ability to maintain attention and concentration, a fair ability to accept instructions from supervisors and respond appropriately, a poor ability to sustain an ordinary routine without special supervision, a poor ability to complete a normal workday or workweek without interruption at a consistent pace, a poor ability to interact with coworkers and a poor ability to deal with various changes in the work setting.  She would also have a moderate likelihood of emotionally deteriorating in the workplace.  AR 148-149.

On September 12, 2005, Plaintiff had x-rays of her lumbosacral spine taken.  The images revealed questionable lumbarization of L6 versus 5 lumbar-shaped vertebral bodies and small riblets at T12.  There were no compression deformities or malalignment.  The images also showed questionable early degenerative changes of the left SI joint.  AR 156.

On September 17, 2005, Plaintiff saw Pedram Enayati, M.D., for a consultive physical examination.  She complained of severe depression, a history of multiple syncopal episodes over the past 2 years and a history of severe back and spine pain for the past 5 to 6 months.  Plaintiff reported that during one episode, she fell and fractured her left fifth metatarsal.  She reported another episode where she fell and hit her head and had to be hospitalized due to an altered mental status.  Plaintiff stated that she has seen multiple physicians for this problem but they

have not found a cause of her falls.  She also explained that her constant, chronic back pain began after a falling episode in which she fell and injured her back.  The pain does not radiate and is much worse when she lies down on her back.  As to her depression, Plaintiff reported that she is on multiple medications that slightly help her symptoms, though she continues to have severe anhedonia and is unable to take pleasure in any activities.  She denied suicidal ideations and admitted to worsening forgetfulness.  Plaintiff does not cook and occasionally needs help from her husband when dressing and showering.  AR 150-151.

On examination, Plaintiff appeared severely depressed during the entire history and physical.  She constantly cried and when asked why, she stated that it was mostly due to the pain in her back.  Her affect was very flat and she did not make good eye contact.  Plaintiff had decreased range of motion in her neck and tenderness to palpation of the cervical spine, thoracic spine and lumbar spine.  She also had paraspinal tenderness on both the right and left.  There was evidence of clubbing in Plaintiff's bilateral hands, but no edema, and evidence of bilateral atrophy of her thighs.  There was tenderness to palpation in the muscles of her bilateral upper extremities and tenderness to palpation of the left foot fifth metatarsal bone.  Pulses were +4 in all extremities.  Plaintiff had extreme difficulty raising from a sitting position and exhibited difficulty sitting on the examination table.  When asked to stand erect, she could not do so for more than 3 seconds due to pain in her back.  She has to lean forward in order to stand in a comfortable stance.  Range of motion in her spine was decreased and straight leg raising was negative bilaterally.  There was no evidence of joint swelling or joint tenderness on examination of the bilateral hands, wrists or elbows.  Plaintiff had 4/5 muscle strength in her bilateral extremities with decreased muscle bulk in her bilateral upper extremities and bilateral thighs.  Sensory examination and deep tendon reflexes were normal.  AR 152-154.

Dr. Enayati diagnosed severe depression, low back pain and cervical spine tenderness and a history of syncopal episodes with unknown cause.  He believed that she could stand and walk for 0 to 2 hours, but could not stand erect.  She could sit for 4 to 6 hours, but could not sit erect.  Plaintiff would need a walker if she planned on walk long distances or on uneven terrain.  She could lift and carry 10 to 20 pounds bilaterally.  Plaintiff could not perform prolonged bending,

1    stooping or crouching and would be limited to frequent reaching, handling and fingering.  Dr.

2    Enayati believed that Plaintiff would need medical follow-up for her left foot, her lumbar and

3    cervical spine, and for possible neuropathy secondary to cervical or lumbar impingement.  AR

4    154-155.

5        A bone density test performed on May 5, 2005, suggested osteopenia.  AR 200-201.

6        From May 2005 through December 2005, Plaintiff complained of pain in her back, neck

7    and right shoulder.  In September 2005, Plaintiff cried during the examination and was diagnosed

8    with depression.  AR 189, 193-199.

9        On December 9, 2005, State Agency physician O. Nawar, M.D., completed a Physical

10   Residual Functional Capacity Assessment.  He opined that Plaintiff could lift 20 pounds

11   occasionally, 10 pounds frequently, stand and/or walk for about 6 hours and sit for about 6 hours.

12   Plaintiff had to avoid driving because of her limited far acuity and field of vision.  She also had

13   to avoid concentrated exposure to fumes, etc., and hazards.  AR 232-239.  This opinion was

14   affirmed on October 6, 2006.  AR 239.

15       On December 20, 2005, State Agency physician Evangeline Murillo, M.D., completed a

16   Psychiatric Review Technique Form.  She opined that Plaintiff had mild restrictions in activities

17   of daily living, mild difficulties in maintaining social functioning and mild difficulties in

18   maintaining concentration, persistence or pace.  AR 211-224.  In a Mental Residual Functional

19   Capacity Assessment, Dr. Murillo opined that Plaintiff would have moderate limitations in her

20   ability to understand, remember and carry out detailed instructions.  Plaintiff could sustain

21   simple, repetitive tasks with adequate pace and persistence.  She could also adapt and relate to

22   coworkers and supervisors.  AR 225-227.  This opinion was affirmed on October 17, 2006, by

23   State Agency physician Archimedes Garcia, M.D.  AR 227.

24       On January 18, 2006, Plaintiff continued to complain of back pain, neck pain and right

25   shoulder pain.  Plaintiff was calm and not in distress, but appeared withdrawn.  AR 186.

26       Plaintiff was seen at Kings Winery Medical Clinic on January 27, 2006.  She complained

27   of right shoulder pain and neck pain after a recent fall.  She denied dizziness at the time of the

28   fall and reported a similar episode in April 2005.  On examination, she had decreased range of

8

motion in her right shoulder and could not turn her neck fully to either side.  Plaintiff was diagnosed with a right shoulder strain/sprain, syncope, osteopenia and allergy/heartburn.  AR 185.

On February 7, 2006, Plaintiff underwent an EEG based on her history of syncopal episodes.  The EEG was normal.  AR 158.

Plaintiff returned to Kings Winery Medical Clinic on February 22, 2006.  She complained of pain in the back of her neck, upper back, legs and shoulders, as well as headaches and stomach aches.  On examination, Plaintiff had tenderness to palpation of her lower back, the back of her neck and her right shoulder.  She had decreased range of motion in her right shoulder.  Plaintiff was diagnosed with osteopenia, right shoulder pain, low back pain, asthma, gastritis, migraine headaches and a cold.  AR 185.

On March 11, 2006, Plaintiff complained of coughing, chest pain, headaches and back pain.  She was active and not in distress.  She was diagnosed with probable pneumonia/bronchitis and given medication.  AR 180.

Plaintiff was seen at Kings Winery Medical Center on March 25, 2006, for mental health treatment.  Plaintiff looked "down in the dumps" and reported poor sleep, low energy and lack of interest.  She had a depressed mood, with blunted affect.  Plaintiff was almost tearful and complained of forgetfulness.  She was diagnosed with somatoform disorder, not otherwise specified, and was taking Paxil and Trazadone.  AR 276.

On March 28, 2006, Plaintiff saw Ko Fang, Ph.D., at Fresno County Mental Health.  Plaintiff reported depression since 1986, with worsening since 2000.  She reported feeling overwhelmed and anxious and described a prior suicide attempt by hanging.  Dr. Fang noted that Plaintiff's depression and anxiety were severe.  Her cognitive performance was severely impaired and he considered her a "severe" danger to herself.  AR 240-244.

In May and June 2006, Plaintiff began reporting right arm pain.  AR 272, 274.  In July 2006, Plaintiff was in no acute distress, though she seemed sad.  AR 272.

Plaintiff received mental health treatment at Kings Winery Medical Clinic on June 3, 2006.  She reported that her medication was helpful until it wore off and she was told that she

was supposed to take the medication twice a day.  Plaintiff was depressed with a blunted affect.
Her medications were changed.  AR 273.

A July 22, 2006, x-ray of Plaintiff's right elbow was normal.  AR 271.

In September 2006, Plaintiff reported right elbow pain, numbness in her right arm and
pain in her upper and lower back.  AR 269, 270.  Her back was tender to palpation and Plaintiff
appeared sad.  AR 269.

Plaintiff continued to complain of back, neck and shoulder pain in October, November
and December 2006.  AR 266, 269.

On November 3, 2006, Plaintiff saw her provider for mental health treatment.  The notes
are difficult to read, but it appears that she was depressed, with a blunted, tearful affect.  Plaintiff
reported auditory hallucinations.  She was diagnosed with major depressive disorder, recurrent,
and somatoform disorder, not otherwise specified.  Her medications included Zyprexa, Effexor
and Trazadone.  AR 267.

Plaintiff received mental health care on January 13, 2007, at Kings Winery Medical
Clinic.  She reported that her medications helped during the daytime, though she heard voices
and saw things.  Wellbutrin and Risperdal were added to her medications.  AR 265.

Plaintiff was seen at Kings Winery Medical Clinic in January and February 2007.  She
complained of back, shoulder and stomach pain.  Examination of her abdomen was benign and
her neck was supple.  AR 264.

A February 2007 CT scan showed a normal appendix, normal kidneys and a normal
bladder.  AR 262-263.

From March 2007 through July 2007, Plaintiff continued to complain of back pain,
shoulder pain and headaches.  Plaintiff was in no acute distress and showed no abnormalities
during this time.  AR 250-253, 258-261.

An audiogram performed on May 1, 2007, revealed bilateral moderate to severe
sensorineural hearing loss.  AR 244-245.

Plaintiff returned for mental health treatment at Kings Winery Medical Clinic on June 8,
2007.  Plaintiff had a depressed mood and blunted affect.  Plaintiff reported that her son normally

drops off his baby at the house, but last week he did not drop the baby off and Plaintiff continued to hear a baby cry.  Plaintiff was taking Zyprexa, Trazadone, Celexa and lithium carbonate.  AR 252.

On July 17, 2007, Dr. Fang completed a Mental Impairment Questionnaire.  He stated that he has seen Plaintiff 1-2 times per month since October 2005.  Plaintiff was taking numerous medications, including Celexa, Zyprexa, lithium carbonate, Trazodone and Soma.  As clinical findings, Dr. Fang listed impaired memory and judgment, poor concentration, and poor reality testing and concrete thinking.  Plaintiff had no insight and was very tangential.  Her prognosis was poor.

Dr. Fang believed that Plaintiff was seriously limited in, but not precluded from, understanding, remembering and carrying out very short and simple instructions and maintaining socially appropriate behavior.  She was unable to meet competitive standards in maintaining attention for two hour segments, maintaining regular attendance, making simple work-related decisions, performing at a consistent pace, asking simple questions or requesting assistance, accepting instructions and responding appropriately to criticism, getting along with coworkers, responding appropriately to changes in the work setting, being aware of normal hazards, dealing with the stress of semi-skilled or skilled work, interacting appropriately with the general public and adhering to basic standards of neatness and cleanliness.  Plaintiff had no useful ability to remember work-like procedures, sustain an ordinary routine, work in coordination with others, complete a normal work day or work week and deal with normal stress.  She also had no useful ability to understand, remember and carry out detailed instructions or to set realistic goals, travel in an unfamiliar place or use public transportation.  AR 287-290.

Dr. Fang estimated that Plaintiff had a low IQ.  He also noted that Plaintiff's psychiatric condition exacerbated her experience of pain and/or other physical symptoms.  Plaintiff had marked limitations in activities of daily living, maintaining social functioning and in concentration, persistence or pace.  He noted that Plaintiff had 4 or more repeated episodes of decompensation.  AR 290-292.

1    <u>ALJ's Findings</u>

2         The ALJ determined that Plaintiff had the severe impairments of mild scoliosis of the

3    spine, bilateral hearing loss, syncope, somatoform disorder and major depressive disorder.  AR

4    19.  Despite these impairments, the ALJ determined that Plaintiff retained the residual functional

5    capacity ("RFC") to lift and carry 20 pounds occasionally, 10 pounds frequently, and sit, stand

6    and walk for 6 hours each.  Plaintiff would be precluded from activities requiring exposure to

7    unprotected heights, dangerous moving machinery and concentrated exposure to loud noise.  She

8    could perform simple, repetitive tasks, maintain attention, concentration, persistence and pace,

9    adapt to usual changes in the work setting, adhere to safety rules and relate and interact with

10   others.  AR 20.  With this RFC, the ALJ determined that Plaintiff could perform the positions of

11   flower picker, housekeeper/cleaner and tier.  AR 28.

12                                   **SCOPE OF REVIEW**

13        Congress has provided a limited scope of judicial review of the Commissioner's decision

14   to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations,

15   the Court must determine whether the decision of the Commissioner is supported by substantial

16   evidence.  42 U.S.C. 405 (g).  Substantial evidence means "more than a mere scintilla,"

17   *Richardson v. Perales*, 402 U.S. 389, 402 (1971), but less than a preponderance.  *Sorenson v.*

18   *Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  It is "such relevant evidence as a

19   reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at

20   401.  The record as a whole must be considered, weighing both the evidence that supports and

21   the evidence that detracts from the Commissioner's conclusion.  *Jones v. Heckler,* 760 F.2d 993,

22   995 (9th Cir. 1985).  In weighing the evidence and making findings, the Commissioner must

23   apply the proper legal standards.  *E.g.*, *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).

24   This Court must uphold the Commissioner's determination that the claimant is not disabled if the

25   Secretary applied the proper legal standards, and if the Commissioner's findings are supported by

26   substantial evidence.  *See Sanchez v. Sec'y of Health and Human Serv.*, 812 F.2d 509, 510 (9th

27   Cir. 1987).

28

**REVIEW**

In order to qualify for benefits, a claimant must establish that he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c (a)(3)(A). A claimant must show that he has a physical or mental impairment of such severity that he is not only unable to do her previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989). The burden is on the claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990).

In an effort to achieve uniformity of decisions, the Commissioner has promulgated regulations which contain, inter alia, a five-step sequential disability evaluation process. 20 C.F.R. §§ 404.1520 (a)-(f), 416.920 (a)-(f). Applying this process in this case, the ALJ found that Plaintiff: (1) had not engaged in substantial gainful activity since the alleged onset of her disability; (2) has an impairment or a combination of impairments that is considered "severe" (mild scoliosis of the spine, bilateral hearing loss, syncope, somatoform disorder and major depressive disorder) based on the requirements in the Regulations (20 CFR §§ 416.920(b)); (3) does not have an impairment or combination of impairments which meets or equals one of the impairments set forth in Appendix 1, Subpart P, Regulations No. 4; (4) has no past relevant work; but (5) could perform a significant number of jobs in the national economy. AR 19-28.

Here, Plaintiff argues that the ALJ (1) improperly analyzed the medical evidence; (2) improperly rejected Plaintiff's allegations; (3) improperly rejected the lay witness testimony; (4) erred in relying on the VE's testimony; and (5) failed to propound a complete hypothetical to the VE.

**DISCUSSION**

A.      Plaintiff's Credibility

As the ALJ's credibility analysis impacts other issues, the Court will address this issue first.  Plaintiff contends that the ALJ failed to set forth legitimate reasons for rejecting her testimony.

In *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), the Ninth Circuit summarized the pertinent standards for evaluating the sufficiency of an ALJ's reasoning in rejecting a claimant's subjective complaints:

> An ALJ is not "required to believe every allegation of disabling pain" or other non-exertional impairment.  *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989). However, to discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific, cogent reasons for the disbelief.'" *Morgan*, 169 F.3d at 599 (quoting *Lester*, 81 F.3d at 834).  The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id*.  Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id*.

> Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony. . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules.  *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, ... and are to be relied upon as precedents in adjudicating cases."); *see Daniels v. Apfel,* 154 F.3d 1129, 1131 (10th Cir.1998) (concluding that ALJ's decision at step three of the disability determination was contrary to agency regulations and rulings and therefore warranted remand).  Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

The ALJ began his credibility analysis by explaining that despite her severe complaints, the record contained little objective support.  For instance, although Plaintiff had an extensive history of complaints of back and neck pain, the x-rays showed only mild scoliosis and early degenerative changes.  Although Plaintiff had muscle spasms on rare occasions, her examinations generally revealed only tenderness to palpation.  AR 25.  The ALJ also notes Plaintiff's unsupported allegations of hospitalization due to an altered mental state and her exaggerated behavior during the consultive examination.  AR 25.

The ALJ is entitled to cite a lack of objective evidence so long as it is not the sole basis for rejecting a claimant's testimony.  *Lester v. Chater*, 81 F.3d 821, 834 (9th Cir. 1996).  In this regard, the ALJ correctly noted the lack of evidence supporting a claimed hospitalization and Plaintiff's exaggerations.  However, as Plaintiff points out, the ALJ found that Plaintiff suffered from the severe impairment of somatoform disorder.  The ALJ recognizes that "her psychiatric care provider notes indicate she has a somatoform disorder, which would explain her unsupported pain complaints."  AR 25.  The Court agrees that citing a lack of objective evidence, in light of the ALJ's finding that there was a psychological reason for her complaints of pain, was improper.  The ALJ next cites inconsistencies in Plaintiff's reports of the origin of her back pain.  According to the ALJ, Plaintiff has reported that her back pain began with a motor vehicle accident, a trip and fall where she hit her head and a syncopal episode.  AR 25.  In her pain questionnaire dated August 28, 2005, Plaintiff reported that her back pain started after a car accident.  AR 93.  However, less than one month later, she told Dr. Enayati that her back pain began after "a falling episode in which she fell and hit her back."  AR 151.  Similarly, in April 2005, Plaintiff reported that she hurt her back after tripping on something and falling on a concrete surface.  AR 206.

The ALJ also cites apparent inconsistencies in Plaintiff's reports of suicidal thoughts, though his reasoning is not quite clear.  AR 26.  He states, "with the exception of two separate notations, the claimant has reported suicidal thoughts, but no intent or attempts; once she declared she had tried to hang herself and another time she said she was going to take pills."  AR 26.  A review of the record indicates that her reports are not necessarily inconsistent, however.[2] On September 8, 2005, Plaintiff told Dr. Hirokawa that she did not have current suicidal ideations and that she had no history of suicide attempts, though she did say that she occasionally thinks about suicide.  AR 144,146.  A few days later, Plaintiff told her treating source that she had silver cleaner to kill herself.  AR 194.  Plaintiff denied suicidal thoughts in October 2005, but in March 2006, she reported a history of trying to hang herself.  AR 193, 240.  Just over two

---

[2] The Court also questions whether it is appropriate to question a mentally-impaired claimant's credibility based on her reports of suicidal thoughts and/or attempts.

15

months later, she reported two prior attempts to overdose on pills.  AR 273.  These reports are not inconsistent enough to legitimately reject Plaintiff's credibility.

The ALJ next notes that during "major evaluations," Plaintiff reports flashbacks of the war, but this is not a theme of her ongoing mental health treatment.  AR 26.  Plaintiff reported flashbacks to Dr. Hirokawa in September 2005.  She also described nightmares and flashbacks to Dr. Fang during her mental health assessment in March 2006.  AR 240.  The simple fact that she does not appear to continue discussing flashbacks in other treatment notes, however, doesn't necessarily detract from her credibility.

The ALJ also makes an issue of Plaintiff's place of birth.  He explains that Plaintiff reported that she fled from Laos to Thailand, but her residency card indicates that she was born in Thailand.  AR 26.  There is no record of her residency card, however, and in the evidence before the ALJ, Plaintiff consistently states that she was born in Laos.  During the hearing, Plaintiff testified that she was born in Laos and that she brought 5 children with her to the United States from Thailand.  AR 47, 49.  She told Dr. Hirokawa that she was born in Laos.  AR 144.  Similarly, Plaintiff told Dr. Fang that she fled to Thailand after hiding for several years in the jungles of Laos.  AR 240.  After staying in Thai refugee camps for several years, she and her family came to the United States.  AR 240.  The ALJ's attempt to question Plaintiff's credibility based on a single, unclear document that is not in the record is not legitimate.

The ALJ goes on to describe Plaintiff's conservative treatment.  For example, Plaintiff has not received treatment consistent with significant degenerative disc disease "such as physical therapy, use of a TENS unit or even strong pain medication."  Nor has Plaintiff been referred to an orthopedic specialist.  AR 25.  *Parra v. Astrue*, 481 F.3d 742, 750 (9th Cir. 2007) (evidence of "conservative treatment," such as a claimant's use of only over-the-counter pain medication,  is sufficient to discount a claimant's testimony regarding severity of an impairment).

Plaintiff contends that the ALJ should not have questioned the conservative treatment given Plaintiff's somatoform disorder, explaining that it would be unreasonable for her physician's to prescribe her strong medications, etc.  The Court agrees.  Having determined that

Plaintiff had an explanation for her pain that was not objective in nature, it is inconsistent for the ALJ to now find her not credible based on a lack of more aggressive physical treatment.

Finally, the ALJ sets out Plaintiff's daily activities and compares them to her severe allegations. For example, Plaintiff attends church once a week, attended the Hmong New Year celebration and reads the Bible with her children. Plaintiff also reported taking care of her youngest child, who was six years old at the time of the hearing. She also told one examiner that she has a disabled child at home. Plaintiff's function report indicates that she is able to dust, do dishes and very light household chores. AR 26.

The Court questions whether such activities are substantial enough to find that Plaintiff's allegations are not credible. In any event, given that the majority of the ALJ's analysis of Plaintiff's subjective complaints is not supported, a citation to her scant activities does not bolster the analysis.

While the ALJ does cite certain legitimate reasons to question Plaintiff's credibility, a majority of the analysis is simply unsupported. The Court finds that the ALJ's credibility analysis is not supported by substantial evidence or free from legal error.

B.   Analysis of Medical Opinions

Plaintiff first argues that the ALJ erred in rejecting the opinions of her treating psychologist, Dr. Fang, and consultive examiners Dr. Hirokawa and Dr. Enayati.

Cases in this circuit distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians). As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant. *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir.2007); *Winans v. Bowen*, 853 F.2d 643, 647 (9th Cir.1987). At least where the treating doctor's opinion is not contradicted by another doctor, it may be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir.1991). Even if the treating doctor's opinion is contradicted by another doctor, the Commissioner may not reject this

opinion without providing "specific and legitimate reasons" supported by substantial evidence in the record for so doing. *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir.1983).

The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir.1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir.1984). As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. *Pitzer*, 908 F.2d at 506. And like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir.1995).

The opinion of a nonexamining physician cannot, by itself, constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician. *Pitzer*, 908 F.2d at 506 n. 4; *Gallant*, 753 F.2d at 1456. In some cases, however, the ALJ can reject the opinion of a treating or examining physician, based in part on the testimony of a nonexamining medical advisor. *E.g., Magallanes v. Bowen*, 881 F.2d 747, 751-55 (9th Cir.1989); *Andrews*, 53 F.3d at 1043; *Roberts v. Shalala*, 66 F.3d 179 (9th Cir.1995). For example, in *Magallanes*, the Ninth Circuit explained that in rejecting the opinion of a treating physician, "the ALJ did not rely on [the nonexamining physician's] testimony alone to reject the opinions of Magallanes's treating physicians...." *Magallanes*, 881 F.2d at 752 (emphasis in original). Rather, there was an abundance of evidence that supported the ALJ's decision: the ALJ also relied on laboratory test results, on contrary reports from examining physicians, and on testimony from the claimant that conflicted with her treating physician's opinion. *Id*. at 751-52.

*Plaintiff's Physical RFC*

In finding Plaintiff capable of modified light work, the ALJ adopted the opinion of State Agency Dr. Nawar over that of consultive examiner Dr. Enayati. Dr. Enayati believed that Plaintiff (1) could stand and/or walk for 0-2 hours, but could not stand erect; (2) could sit for 4-6 hours, but could not sit erect; (3) could lift and 10 to 20 pounds; (4) could not perform prolonged

bending, stooping or crouching; and (5) would be limited to frequent reaching, handling and fingering.  AR 154-155.

In rejecting his opinion, which would have prevented the performance of any work, the ALJ explained that it was "obvious that the claimant exaggerated her symptoms at the time of the evaluation."  AR 27.  Similarly, the ALJ found that Dr. Enayati's severe restrictions were not supported by the objective evidence.[3]

Indeed, many of Plaintiff's claims to Dr. Enayati were not supported by the record.  For example, she reported that she was once hospitalized due to an altered mental status, but there was no record of any such hospitalization.  In fact, just a few days prior, Plaintiff denied any psychiatric hospitalizations to Dr. Hirokawa.  AR 145.

Plaintiff also reported that her pain was much worse when she lies down on her back, but she testified that she lies down during the day more than she stands, about 7 to 8 times per day. AR 57-58.  During her examination, Plaintiff had extreme difficulty raising from a sitting position, exhibited difficulty sitting on the examination table and was unable to stand erect for more than 3 seconds.  As the ALJ noted, there are no similar observations of such extreme physical limitations in any treatment notes, nor were similar symptoms seen at the hearing.  AR 25.  In fact, although Plaintiff continued to complain of pain in her back and neck, neither her physical examinations nor diagnostic testing revealed findings that would suggest such drastic problems.  While Dr. Enayati did make certain objective findings, it was reasonable for the ALJ to conclude that the findings would not support such a restrictive RFC.  *Magallenes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)* (a lack of supporting clinical findings is also a valid reason for rejecting a treating physician's opinion).

Plaintiff contends that Dr. Enayati would have noted exaggerations had Plaintiff been exaggerating to the extent suggested by the ALJ.  Yet his failure to do so does not prohibit the ALJ from comparing his severe restrictions to the evidence in the record.  Plaintiff points to the

---

[3] Insofar as Plaintiff faults the ALJ for rejecting Dr. Enayati's opinion based on the lack of a treating source statement, it is not clear from the ALJ's analysis that he cited this as a reason for rejecting the opinion.  Rather, it appears to the Court the ALJ was simply stating a fact by explaining that Plaintiff's "treating care providers have provided no opinions as to her physical functional capacity."  AR 27.

fact that Dr. Enayati performed his own examination and found "significant abnormalities such as limited cervical range of motion, bilateral thigh atrophy, and limited range of motion of Plaintiff's lumbar spine and hips and shoulders."  Reply, at 3.  Again, however, while there may have been certain objective findings, the ALJ was entitled to conclude that such findings did not support Dr. Enayati's severe physical restrictions.

In rejecting Dr. Enayati's opinion, the ALJ adopted the opinion of State Agency physician Dr. Nawar.  AR 27.  The opinion of a non-examining physician may be accepted as substantial evidence if it is supported by other evidence in the record and is consistent with it.  *Lester v. Chater*, 81 F.3d 821, 830-831 (9th Cir. 1995).  In other words, there must be substantial evidence, other than the non-examining physician's opinion, to support the rejection of contrary conclusions by the treating and/or examining source.  *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).

As discussed above, the ALJ identified several legitimate reasons to reject Dr. Enayati's opinion as unsupported for reasons unrelated to Dr. Nawar's contrary opinion.  Moreover, the ALJ explained that Dr. Nawar's opinion was consistent with his RFC analysis, which included a thorough analysis of the medical evidence.  AR 22-27.  Indeed, Dr. Nawar also reviewed the medical evidence and concluded that he could not find "strong evidence of significant pathology."  AR 230.  The x-rays were "not impressive" and there was no supportive evidence for Dr. Enayati's "overly restrictive" opinion.  AR 230.

In October 2006, State Agency physician Sadda Reddy, M.D., reviewed the recent evidence in assessing Dr. Nawar's opinion.  AR 210.  Dr. Reddy noted that treating notes from January 2006 indicated an essentially normal examination, with no motor or sensory deficit and a non-tender back.  AR 210.  While treatment notes from February 2006 reveal tenderness in the low back, back of neck and right shoulder, notes from March 2006 indicate that Plaintiff was active and in no acute distress.  *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002) ("[t]he opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record.").

Plaintiff suggests that the ALJ gave Dr. Nawar's opinion significant weight not because it was supported by the record, but because it was the only remaining medical opinion. Plaintiff's belief that it was not supported is based, however, on her own interpretation of the evidence and it does not invalidate the ALJ's contrary, yet supported, conclusion. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989).

The ALJ's analysis of the opinions relating to Plaintiff's physical impairments was supported by substantial evidence and free of legal error.

*Plaintiff's Mental RFC*

In finding Plaintiff capable of performing simple, repetitive tasks, maintain attention, concentration, persistence and pace, adapt to usual changes in the work setting, adhere to safety rules and relate and interact with others, the ALJ gave little weight to Dr. Hirokawa, the examining physician, and Dr. Fang, Plaintiff's treating source. AR 20, 27. Both Dr. Hirokawa and Dr. Fang assigned mental limitations that would have prevented work. Instead, the ALJ "gave weight" to the opinion of State Agency physician Dr. Murillo, which he found to be consistent with his analysis of the evidence.

The ALJ first explained that he rejected Dr. Hirokawa's opinion because it rested mainly on Plaintiff's subjective complaints. AR 27. The Court has found, however, that the ALJ did not properly reject Plaintiff's subjective complaints and the Court therefore cannot reject Dr. Hirokawa's opinion on this basis.

The ALJ next explains that his opinion was "somewhat internally contradictory." AR 27. For example, although Dr. Hirokawa believes that Plaintiff has a "fair" ability to understand and remember very short and simple instructions, Plaintiff was able to perform a simple two step command. AR 27, 147-148. The Court questions, though, whether this is actually inconsistent. Dr. Hirokawa also believes that Plaintiff has a poor ability to maintain attention and concentration, though he found that Plaintiff's concentration for conversation was adequate during the examination. AR 27, 147-148. The Court also questions whether concentration sufficient to converse during an examination translates into the ability to maintain attention and concentration throughout the workday.

1    Based on the above, the Court finds that the ALJ did not set forth specific and legitimate

2    reasons to reject Dr. Hirokawa's opinion.

3    The ALJ next explained why he rejected Dr. Fang's severe restrictions.  He first noted

4    that Dr. Fang did not provide any treatment notes to support his opinions.  AR 27.  In fact,

5    although Dr. Fang stated that he treated Plaintiff 1 to 2 times per month since October 2005, the

6    record contained only an initial mental health assessment performed by Dr. Fang in March 2006.

7    AR 240-243.  Plaintiff suggests that the ALJ should have requested Dr. Fang's records.  At the

8    very least, given the importance of a treating source's opinion, the ALJ should have at least

9    inquired about the records at the hearing prior to using it as a basis for rejecting the opinion.

10   The ALJ next notes that Plaintiff's treating care provider, rather than mental health,

11   prescribed her medications.  AR 27.  Plaintiff argues that this is improper, as Dr. Fang is a

12   psychologist and cannot prescribe medications.  Regardless of whether Dr. Fang can or cannot

13   prescribe medications, he specifically states in March 2006 that Plaintiff was taking medications

14   prescribed by a psychiatrist.  AR 241.  He also states in July 2007 that Plaintiff's medications

15   were prescribed by both a psychiatrist and a family doctor.  AR 287.  It was therefore incorrect

16   for the ALJ to suggest that Plaintiff's mental impairments were somehow less severe because she

17   received her medications from a general practitioner.

18   The ALJ also explains that Dr. Fang's limitations "appear to be contrary" to Plaintiff's

19   own admitted level of daily functioning.  AR 27.  For example, earlier in his opinion, the ALJ

20   cited Plaintiff's testimony, both at the hearing and in the function report, that she could dust, do

21   dishes, perform very light chores, attend church weekly and read the Bible with her children.  AR

22   26.  The ALJ also observed that Plaintiff was able to pay attention during the hearing.  AR 26-27.

23   As discussed earlier in this decision, the Court questions whether these activities are sufficiently

24   "contrary" to Dr. Fang's limitations.

25   Finally, elsewhere in his opinion, the ALJ explains that despite Dr. Fang's statement that

26   Plaintiff has had multiple episodes of decompensation, he does not identify what events he refers

27   to and there is nothing in the record showing emergency medical treatment.  AR 27.

28

Given the importance of the treating source's opinion and the ALJ's numerous errors in his analysis, the Court cannot conclude that the ALJ's analysis of Dr. Fang's opinion was supported by substantial evidence. As a result, the Court cannot determine whether the ALJ properly adopted State Agency physician Dr. Murillo's opinion.

Based on the above, the Court finds that the ALJ's analysis of the medical evidence relating to Plaintiff's mental impairment was not supported by substantial evidence or free of legal error.

C.      Lay Witness Testimony

Plaintiff next contends that the ALJ failed to properly consider the statement of her husband, Chao Lor.

"In determining whether a claimant is disabled, an ALJ must consider lay witness testimony concerning a claimant's ability to work." *Bruce v. Astrue*, 557 F.3d 1113 (9th Cir. 2009) (*citing Stout v. Comm'r*, 454 F.3d 1050, 1053 (9th Cir.2006)); *see also* 20 C.F.R. §§ 404.1513(d)(4), (e). Such testimony is competent evidence and "cannot be disregarded without comment." *Id.* (*citing Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir.1996)). If an ALJ disregards the testimony of a lay witness, the ALJ must provide reasons that are germane to each witness. Further, the reasons "germane to each witness" must be specific. *Stout*, 454 F.3d at 1054 (explaining that "the ALJ, not the district court, is required to provide specific reasons for rejecting lay testimony").

The ALJ explained that Mr. Lor's Third Party Report was very similar to Plaintiff's testimony. He rejected the report, however, because (1) Mr. Lor had a financial advantage to establish his wife's disability; and (2) it was unsupported by a bulk of the record. AR 26.

Plaintiff argues that the ALJ's rejection of Mr. Lor's testimony on the basis that he is financially interested is improper. Plaintiff is correct and such rejections are contrary to recent Ninth Circuit case law. Generally, the fact that a lay witness is a family member is not grounds for rejecting the testimony absent specific evidence of bias. *Valentine v. Comm'r of Soc. Sec. Admin.*, 574 F.3d 685, 694 (9th Cir.2009). The ALJ cites no such specific evidence here.

1   The ALJ also rejects Mr. Lor's testimony because it was almost identical to Plaintiff's

2   testimony. "Her husband's report almost mirrors her report and was completed on the same day

3   and likely the same time." AR 26. However, as this Court has invalidated the ALJ's analysis of

4   Plaintiff's subjective complaints, the ALJ cannot rely on this to reject Mr. Lor's complaints.

5   Finally, the ALJ found that Mr. Lor's statements were unsupported by the record. Based

6   on the Court's finding that the ALJ did not properly analyze a large portion of the evidence, the

7   Court cannot find that the ALJ's statement was supported by substantial evidence.

8   The ALJ's treatment of Mr. Lor's testimony was therefore not supported by substantial

9   evidence or free of legal error.

10  D.   Conflict with Dictionary of Occupational Titles

11  Plaintiff next contends that the ALJ erred in relying on the VE's testimony because he

12  failed to confirm that the testimony complied with the Dictionary of Occupational Titles

13  ("DOT").

14  The ALJ must determine whether the positions cited by the VE are consistent with the

15  DOT. The ALJ must then determine whether the VE's explanation for the conflict is reasonable

16  and whether there exists a basis for accepting the VE's testimony over the information contained

17  in the DOT. *Massachi v. Astrue,* 486 F.3d 1149, 1153 (9th Cir. 2007) (citing SSR 00-4p).

18  Where a claimant is illiterate, the ALJ must "definitively explain the deviation." *See Pinto v.*

19  *Massanari,* 249 F.3d 840, 847 (9th Cir. 2001). In *Pinto*, the Ninth Circuit explained:

20  > The ability to communicate is an important skill to be considered when
    > determining what jobs are available to a claimant. Illiteracy seriously impacts an
21  > individual's ability to perform work-related functions such as understanding and
    > following instructions, communicating in the workplace, and responding appropriately to
22  > supervision. These are all factors that Social Security Ruling No. 96-8p requires an ALJ
    > to consider when determining whether a claimant has the residual functional capacity to
23  > perform past relevant work. **Here the ALJ, although noting Pinto's limitation in both
    > his findings of fact and hypothetical to the vocational expert, failed to explain how
24  > this limitation related to his finding that Pinto could perform her past relevant work
    > as generally performed.** See SSR 82-62.

25  *Id*. at 846-847 (emphasis added).

26  Plaintiff's argument is based on the language requirements for the three positions

27  identified. Each has a Language Level of 1, which requires the ability to recognize 2,500 words,

28

read at a rate of 95-120 words per minute and speak simple sentences. Based on the ALJ's finding that Plaintiff is illiterate and cannot communicate in English, Plaintiff contends that there was an unexplained conflict.

The Court agrees. Although the ALJ states in his decision that the VE's testimony is consistent with the DOT, there is absolutely no discussion of the conflict at the hearing. AR 28. The ALJ did not determine whether a conflict existed, nor did he request an explanation for the conflict. Where the ALJ fails to ask the VE if the positions are consistent with the DOT, the Court is unable to determine whether substantial evidence supports the ALJ's finding at step five. *Massachi*, 486 F.3d at 1153.

Defendant urges the Court to uphold the ALJ's finding because the result would not have changed based on the application of the Medical Vocational Guidelines. The Court declines to undertake such an analysis where the ALJ specifically found that Plaintiff's ability to perform the full range of work was impeded by additional limitations. AR 35. *Desrosiers v. Secretary of Housing and Health Services*, 846 F.2d 573, 577 (9th Cir. 1988).

Accordingly, the ALJ's finding at step five is not supported by substantial evidence and is not free of legal error.

E.      Complete Hypothetical

Finally, Plaintiff contends that the ALJ failed to propound a complete hypothetical because his RFC failed to include accommodations related to the step two finding. Specifically, Plaintiff argues that the RFC failed to take into account the ALJ's determination that Plaintiff had moderate limitations in social functioning and moderate limitations in concentration, persistence and pace.

Plaintiff argues that by definition, a "severe" impairment causes significant limitation and must therefore impact the RFC finding. The Ninth Circuit has flatly rejected this argument, however. In *Bray v. Comm'r Soc. Sec.*, 554 F.3d 1219 (9th Cir. 2009), the plaintiff made a similar argument, contending that a finding at step two that her adjustment disorder was severe required a corresponding limitation in her RFC. The Court rejected the argument, stating, "Bray offers no authority to support the proposition that a severe mental impairment must correspond to

1  limitations on a claimant's ability to perform basic work activities." *Bray,* 554 F.3d at 1128-
2  1129.

3      Moreover, the RFC included a finding that Plaintiff could perform simple, repetitive
4  tasks, which takes into consideration a moderate limitation in concentration, persistence and
5  pace. *Stubbs-Danielson v.Astrue,* 539 F.3d 1169, 1174 (9th Cir. 2008) (an ALJ's assessment of a
6  claimant adequately captures restrictions related to concentration, persistence, or pace where the
7  assessment is consistent with restrictions identified in the medical testimony).

8      The ALJ's hypothetical, only insofar as it did not include limitations based on the ALJ's
9  moderate findings at step two, was supported by substantial evidence and free of legal error.

10  F.    Remand

11      Section 405(g) of Title 42 of the United States Code provides: "the court shall have the
12  power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying,
13  or reversing the decision of the Secretary, with or without remanding the cause for a rehearing."
14  In social security cases, the decision to remand to the Commissioner for further proceedings or
15  simply to award benefits is within the discretion of the court. *McAllister v. Sullivan,* 888 F.2d
16  599, 603 (9th Cir. 1989). "If additional proceedings can remedy defects in the original
17  administrative proceedings, a social security case should be remanded. Where, however, a
18  rehearing would simply delay receipt of benefits, reversal and an award of benefits is
19  appropriate." *Id.* (citation omitted); *see also Varney v. Sec. of Health & Human Serv.,* 859 F.2d
20  1396, 1399 (9th Cir.1988) ("Generally, we direct the award of benefits in cases where no useful
21  purpose would be served by further administrative proceedings, or where the record has been
22  thoroughly developed.").

23      Here, the ALJ's failure to properly analyze Plaintiff's subjective complaints impacted the
24  ALJ's overall decision. In remanding this action, the Court is *not* suggesting that Plaintiff should
25  have been found disabled. On remand, the ALJ should properly analyze Plaintiff's subjective
26  complaints and conduct further proceedings, if necessary. The ALJ should also analyze the
27  medical evidence and lay witness testimony in accordance with this decision. Finally, the ALJ
28  should ensure that the step four and five findings are supported and consistent with the DOT.

1

2

3                                        **RECOMMENDATION**

4          Based on the foregoing, the Court finds that the ALJ's decision is not supported by

5   substantial evidence and is not based on proper legal standards.  Accordingly, the Court

6   RECOMMENDS that Plaintiff's appeal from the administrative decision of the Commissioner of

7   Social Security be GRANTED and that JUDGMENT be entered for Plaintiff Pao Mee Xiong and

8   against Defendant Michael J. Astrue.

9          This Findings and Recommendation will be submitted to the Honorable Anthony W. Ishii

10  pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within thirty (30) days after being

11  served with this Findings and Recommendation, the parties may file written objections with the

12  court.  The document should be captioned "Objections to Magistrate Judge's Findings

13  and Recommendation."  The parties are advised that failure to file objections within the specified

14  time may waive the right to appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153

15  (9th Cir. 1991).

16

17         IT IS SO ORDERED.

18      **Dated:   August 1, 2011**            **/s/ Dennis L. Beck**
                                          UNITED STATES MAGISTRATE JUDGE
19

20

21

22

23

24

25

26

27

28